Good morning, Your Honors. May it please the Court, my name is Bruce Ankoviak, and I appear for the appellant, Tim Hanson. I would request two minutes reserved time for rebuttal. Granted. Your Honors, to try to put this serious and, in many ways, very complex and difficult matter into some perspective, I would suggest to you that, to convict Tim Hanson of the first-degree murder involving the death of David Smith back in Clearfield County in December of 1987, the Commonwealth faced two very, very substantial, very difficult obstacles. First, they had to win a credibility battle. The District Attorney was absolutely correct in his closing argument that credibility was the most important thing in this case. And the credibility battle was formed because Tim Hanson took the stand and testified that he did not shoot David Smith, that his brother did, not out of malice, not out of a mistaken belief that Dave Smith was someone else, but simply as the accidental outcome of a stupid joke that they were playing. Hanson then, of course, told the jury that the reason he had told the State Police that he was the person who was had prevailed upon him at the age of 15 to take responsibility, assuming that the juvenile system would treat Tim more leniently. His testimony was, to some degree, corroborated by his mother, who testified that Tom admitted to her that he had done the shooting. But absolutely, and in all fairness, his testimony was rebutted by the testimony of Tom and by the testimony of Tom's girlfriend. And others, right? It isn't one of the difficulties with this case that Tim Hanson, over a period of months, told the same story to several people, and that story included Tim being the accidental trigger man. And only during the trial did Tim advise his counsel that that story that he had consistently told many people was wrong, and that, in fact, Tim was not the accidental trigger man, but not the trigger man at all, and that Tom was the trigger man. There's a very important problem here, Your Honor, and that is that Tim Hanson was questioned by the District Attorney about when did you tell your lawyers this. That was an unfortunate line of questioning that I don't think was permissible, but we're beyond that at this point, I agree. But it is clear that his attorneys knew this from the outset of the trial. It was not during the trial that they learned this. Well, they testified at the PCRA hearing that they learned it at trial. Your Honor, Mr. Shaw swore, an attorney, got on the witness stand and swore under oath that he learned at trial. He learned this on the very first day of trial before it began, and the proof positive of this, the proof positive that they were not misled into changing horses in midstream in this case, is the first witness the Commonwealth called, which was Tom Hanson. Tom Hanson was cross-examined by counsel and challenged, weren't you the one that shot this guy? Weren't you the one that did this? That was the very first witness. Counsel knew this from the outset of the trial, and none of their decisions, particularly the decision to call Sarah Brandt as a witness, none of those decisions that the magistrate judge, and this was a tragic error in this case, Judge, a tragic error by the magistrate judge, because it was used to explain as reasonable trial tactics and strategy, calling Sarah Brandt. It can't be explained that way, because counsel knew from the outset what Tim Hanson was going to say when he took the witness stand. So... When you say the outset, though, I mean, they've got a mountain of testimony from Tim in the months preceding the trial, and that first day, the record's equivocal, I think you have to admit. If I were guessing, I would guess that Tim told them on the first day of trial, but in fact, Tim testified that he told them on the second day. You remember that strange questioning where the lawyer sort of says, are you sure? It was yesterday, and Tim says, it was yesterday. The lawyer seemed to imply that it was two days before. That's correct, Your Honor. Tim was obviously confused. When you say the lawyers knew the whole time, I mean, you're preparing your case weeks or months before the trial, and if you learn the first day or the second day of testimony, that the story is 180 degrees opposite of what you had previously been told, that puts the lawyer in a difficult position. I don't doubt that it does, but counsel knew from the beginning of the testimony of this trial, as reflected in the cross-examination of witness number one, exactly what their client was going to say. They knew the theory of the case at that moment, and none of the decisions that they took after that could be excused by the fact that they were surprised to find out, right as the defense case was going to open, that Tim was going to say that his brother did the shooting. It's simply, I understand, Tim Hansen's testimony was a tragic confusion. You can see his lawyers in redirect trying to lead him to this. But they testified, but the most critical thing is the objective evidence of what they cross-examined Tom Hansen about. That proves that they knew this from the outset, and that it can't excuse the decisions that they made. All right, well, let's talk about those decisions. You say they should not have called Sarah Brandt, but they've got to put on some evidence, it would seem, that Tom had a reason to kill his good friend David Smith, right? Tim Hansen testified that it was simply a joke they were pulling on him. The Sarah Brandt testimony, Judge, was properly objected to by counsel when the district attorney tried to get it in during Tom Hansen's direction. Well, we're not sure there was a formal objection. There was a sidebar, and then the lawyer moved on. No, not on that point, Your Honor. Your Honor is correct with regard to the juvenile record. I'm sorry, the juvenile record, you're right. So the Sarah Brandt, right. Not with respect to the hearsay statement of Tom Hansen. Right. They shifted gears on Sarah Brandt. Well, I don't think anybody shifted. Well, the defense counsel shifted gears on Sarah Brandt in a way that I suggest does not meet anywhere near a fundamentally sound or even reasonable strategy. But it puts Tom saying that he's going to kill someone. We just heard argument in a case where it was deemed significant by both sides that the shooter had previously stated there's going to be trouble and I'm going to shoot someone. And Sarah Brandt gave the defense, gave Tim Hansen evidence that Tom Hansen had said, we're going to shoot. I mean, isn't that the best evidence that Tom was the trigger man? What better evidence would there be that Tom was the trigger man? No, Your Honor, it was terrific evidence for the Commonwealth because just as the district attorney, when they were arguing about it was desperate to keep this out, I would put it to this court that district attorney was desperate to get that in because they had no words from Tim Hansen. Nothing that Tim Hansen ever said or did would suggest that he was out looking to kill somebody who came there mistakenly thinking it was a state trooper. This was the only evidence that the Commonwealth had of this and they put it in Tim Hansen's mouth through the hearsay testimony of his brother. And that's where the error in this occurred. The only thing that Sarah Brandt testimony did was incredibly bolster the speculative theory of the Commonwealth as to premeditation because Tim Hansen did not, these words were never attributed to Tim Hansen. Tim Hansen's only statements. That's why it hurts Tom. It gives the defense the opportunity to argue to the jury. My client didn't say he was going to shoot anyone. Tom did. The guy who's pointing the finger at his brother, he said he's going to shoot people. My client never said that. But, Your Honor, the reason the Commonwealth offered it in the first place was because the statement is not Tom said I'm going to shoot. The statement Tom made was we will shoot. And the district attorney must have been smiling from ear to ear when Sarah Brandt was called as the first witness from the defense because this was the opportunity to get that statement in, not a statement the district attorney was going to attribute to Tom in any sense. In fact, the superior court in this case correctly said the Commonwealth was able to say to the jury Tom had no reason to want to fear someone coming to shoot them. The only theory that the Commonwealth had in this case was that Tim did. And by this hearsay statement, the defense offered after successfully keeping it out, the defense handed this to the Commonwealth. And there can't be any reasonable justification for that having been done. They knew what the theory was. In fact, Tim Hanson was the next witness right after Sarah Brandt. And he gets up and has to follow this testimony that the district attorney tried and in his closing argument attributed to Tim. This was fundamentally a horrendous judgment by counsel that cannot be excused as reasonable trial strategy. And it is a central point that filled in one of the great gaps that the Commonwealth had, which was answering the question why did he do it. Remember, Your Honors, the only question the jury asked during their deliberations was to have the judge redefine the concept of intent. Even after all of this, this case did not appear to be anything other than an inexplicable accidental shooting. But the Commonwealth, through testimony like Sarah Brandt... But he didn't run with the... I think there's a lot of evidence to support that. But Tim ran 95 yards, metaphorically, with the accident story. And that could have well gotten him a manslaughter conviction or a third-degree conviction. But for reasons we'll never know, he decides the last five yards he's going to run and say, no, it's not an accident, I didn't do it. And maybe that was because the forensic evidence didn't match up. I don't know. But he ran 95 yards saying it was an accident that could have resulted in a much lower sentence, much lower culpability, and instead he got on the stand and he said, forget everything I said before, it was all a lie, my brother did it. The jury had the right to disbelieve that, didn't it? If, Your Honor, if Tim Henson, for whatever reason, perhaps hoping that at the last minute his brother would own up to the truth, if Tim Henson waited until trial, his lawyers still knew what his testimony was going to be. And they tried this case from the beginning of the evidence to the close of the evidence, understanding that. And none of them, Judge, I understand. But they've got a mountain. I'm still trying to get my arms around how it could be ineffective lawyering when Tim Henson tells a lot of people. A lot of people what happened. He tells troopers. He tells his brother. He tells his mother. He tells his sister Helen. He tells all these people it went down this way. And then at trial he tells a completely different story and looks the jury in the eye and says, everything I said before was a lie. And you're going to say that his lawyers were ineffective in trying to salvage that case? Yes, Your Honor. Lawyers, unfortunately, have trouble with clients from time to time, worse trouble than Tim Henson presented. Is your argument that the worst times that you're alluding to came about because of the Sarah Brandt error and the Sarah Brandt error is really the only error that we need to focus on? No. Oh, no. No, Your Honor. I certainly don't mean to be heard to be abandoning the other issues in the brief. I think the Sarah Brandt error is a very significant one on one important half of this case, which is the failure of the Commonwealth to have any meaningful evidence of premeditation. Okay. Can we go back to what Judge Hardiman was talking about just a second ago? Sorry. So is it your theory that this change of heart at the five-yard line when you're about to score came about because of the Sarah Brandt testimony? Absolutely not. Absolutely not, Your Honor. Again, I hope that this case will not be decided upon the same error that the magistrate judge made, which was to assume that Tim Henson first told his lawyers this at mid-trial. That is empirically not true. They knew this the whole time. Well, does it make a difference whether it was the second day of trial or the first day of trial or five minutes before trial was going to start? I mean, aren't we getting into semantics there? Not at all. Not as the way the magistrate did it because the magistrate's position regarding this was this would excuse arguing out Sarah Brandt's testimony first and then putting it in. But if counsel knew all along what Tim Henson was going to say and they did, this makes sense. How can you say all along? Months and months and months he says, I did it. It was an accident. The day of trial, either the first day of trial or the second day of trial, that's not all along. That's at the 11th hour. But, Judge, there are intelligent attorneys who knew this. Who knew what? They knew that their client was going to go south on them and tell them the exact opposite of what he'd been telling everybody previously? Who knew what he was going to say at trial. They testified that they learned at trial, the day of trial. And they knew it? And it's ambiguous as to whether it's the first day of trial or the second day of trial. At trial is radically different, it seems to me, than knowing all along what your client's going to say. But, Judge, they knew it when they cross-examined Tom, they knew it when they cross-examined Betty, they knew it when they objected to the Sarah Brandt testimony, and they knew it when they called Sarah Brandt as their first witness. They cannot be excused by making that horrendous judgment by lack of knowledge. They did not, they cannot be excused from that. They did know this all along. For all the relevant times that they made judgments, what they knew at the time they made the judgment was what Tim was going to say on his direct testimony. All right. Thank you, Mr. Encore. Thank you, Your Honor. Ms. Lamadou, did I pronounce that correctly? Lamadou. Lamadou. Good morning, Your Honors. You may please support, I am the first assistant DA from Clearfield County, here on behalf of Superintendent Dracovic and the appellees. Commonwealth would first, I guess, it's not in the order of the issues, but as to the Sarah Brandt testimony, just, you know, relate that, as Your Honor has said, the defense counsel testified at the PCRA hearing that it was obvious concern to the defense. Should we put her on or not? But they felt this was the best way to put the gun in Tom Hanson's hands. And if you look at this case, essentially what the jury really had to decide was who pulled the trigger. Was it Tim or was it Tom? And that testimony gives them that incentive to say it was Tom. Because otherwise, you're up against Tom Hanson and Betty Jo Wooten, whose testimonies, although, you know, there's discrepancies, small discrepancies, was the kitchen door open or closed, but for the most part, they say the same thing. They say Tim Hanson had the gun and he shot, not knowing. The brother doesn't say really why, but Betty Jo Wooten says not knowing who it was, he shot. And she also said that he actually asked her who's at the door, and when she said Dave, he didn't believe her. And that was why he shot. So there was evidence there that he was shooting because he was afraid of who was at the door. Other than this one statement, meaning Tim Hanson. Now, the appellant is saying this statement gives the reason why either one of them would have been shooting at the door. But I would submit that it gives the reason why Tom Hanson was the one that had the gun in his hands. Because if he's the one that made this statement, he said, you know, we better make sure that they knew who he was or they were going to shoot. Yes, he says the word they, and that is concerning there, but he's the one that made this statement. There's no evidence that Tim Hanson ever heard this statement or said anything of that nature. So in the absence of, so your view is, excuse me, in the absence of the Sarah Brand testimony, the only testimony that puts the gun in Tom's hand is Tim's testimony and the mom's testimony. Right. And that testimony up against Tom, Betty Jo Wooten's testimony, and the and the fact that Tim is changed is changing his story at the last minute. And if that was known, fully known, you know, to the jury, that it just wouldn't, it wouldn't work up against that type of, you know, contrary evidence. And in addition, you have the fingerprints on the gun where Tim Hanson's fingerprints. You have the nitrate test that Tom Hanson submitted to and Tim Hanson refused to submit to. You have all of that additional evidence, which incriminates Tim. And this one statement, I think they felt they needed something to put forth to say, no, it's Tom, because it's the only thing that really supports their their client's testimony that he's he's coming forth and saying, you know, everything I said wasn't true up until this point. And it was all a lie because I was taking the rap for my brother. So essentially, the comp that would be the Commonwealth's position is that it can't be an effective assistance of counsel because the evidence, contrary to the fact that this was Tom, was too too heavy. And they did need to to make that decision to put that Sarah Brand forth. And, you know, they said they chose to do so because tactically it was the best way to put forth to the jury that it was Tom and not Tim that shot that gun. And I would I would ask your honors to agree with them. And obviously, you understanding that he did change his story at the 11th hour on them and they did have to adjust on the first day of trial. I would submit that it probably was the first day of trial, the way their line of questioning went with him. It seemed like they were indicating he was mistaken. So although the questioning between Tim Tom Hansen and Betty Joe seemed quite different. I mean, they really hammered cross-examination. That is really hammered Betty Joe about Tom being the shooter potentially. And in a 50 page cross-examination of Tom Hansen, there's only one little bit at the very end that said, now you did it, didn't you, Tom? So that raised the question in my mind as to whether they were informed. I would have expected them to have hammered Tom a lot harder if their client had advised them at that point that they were pursuing this new strategy. Right. And I think the reason why they didn't I mean, at the PCRA, I believe they did say that it was the first day of trial. But I think the reason why they didn't was Tom Tom's responses were strong responses. And his responses when they crossed him was I didn't fire the gun that day. You know, they dusted my fingers off and everything. It was basically he's he's pointing them to hard evidence. You know, I submitted to that nitrate test. They dusted my fingers off. There was no evidence that I fired. I didn't fire the gun that day. And I think Tom's responses were strong. And that may be the reason why they they shut down. I mean, obviously, I don't I don't know for certain. We do know there was an error made by defense counsel right at the PCRA. They were mistaken when they testified that their objection had been overruled regarding the admission of Tim Hansen's escape from the juvenile facility. Their objection had been overruled regarding the juvenile record. Yeah, there was a statement made by defense counsel at the PCRA that, well, we we stipulated to the escape because that was already admitted. I couldn't find that in the record. Can you? In the record? Actually, I would submit that it is in the record. It's not point blank in the record. The court didn't come out and say we're making this rolling. But I believe that Attorney Shaw, when he testified at the PCRA and said when they made that first objection, when the prosecutor asked him the question or I'm sorry, Tom, the question of why were you trying to tell him to turn himself in? Defense counsel objected. What the attorney testified to at the PCRA hearing was at that point that a sidebar was held, and at that sidebar the court indicated that it was going to allow the juvenile record to be admitted for the purpose. Well, why are we calling it juvenile record throughout this case? I cannot find in evidence the document that I would call the juvenile record. What I see in evidence is a stipulation of counsel that says if Trooper Zimmerman were called to testify, he would testify that Tim Hansen escaped from the juvenile facility, and we are not going to call Trooper Zimmerman because we have a stipulation about that. That's an oral stipulation that Tim Hansen had escaped from a facility. That's not putting into evidence his juvenile record. Was his record put into evidence? I don't believe his record was. I think how it played out was that he was charged and there had been no adjudication, and the reference to it now as a juvenile record I think is just the fact that we're 20 years after the fact, looking back and summarizing using a short term rather than going through the facts. An inaccurate term. Rather than going through the fact that what it really is is he was in a detention center. He was detained. He was in a detention center, and he escaped, and he was not yet adjudicated. All right, but where in the record can you show me that counsel is correct, counsel Shaw is correct when he testified that the fact of Tim's escape was admitted into evidence? Because I can't find it. When I look at Tom's testimony, Tom was about to say that, and then he gets stopped midstream, and then the lawyer moves on. Yes, and I would submit that what the defense attorney testified to at the PCRA is at that sidebar, they came to the decision, the court says to them, look, we're going to admit this information that he was detained and that he escaped as motive. Where did they admit that, though? I don't see that coming into evidence until the stipulation at the end of the prosecution's case in chief. The only thing that we can go on is what the attorney testified at the PCRA, and he says at that discussion, at that sidebar, this is a 1041A of the record. He says at that discussion, at that sidebar, the court indicated it was going to allow this information that he was detained and that he had escaped in, and, in fact, that then the defense responded and said, well, Your Honor, we would stipulate to that. And my best indication that that, in fact, is true and that the attorney is giving an accurate representation of what happened is that the prosecutor abandons his line of questioning, and it's never brought up again with any other witness because I believe that is a fair and accurate representation of what occurred. They agreed, you're not going to be able to bring it through testimony. We will use a stipulation, and that is the best way that defense counsel can handle that situation. If the court's going to permit it in, as far as— I see. So you read this PCRA testimony to be that, at the sidebar, they determined that that would be admitted by stipulation at a later time in the prosecution's case. Yes, and the reason why they agreed to that was because the court was going to allow— Promote it. Allow it and promote it. Okay, thank you. Yes. And moving, I guess, if Your Honors don't have any other questions on those, to the question on the Fifth Amendment and the Miranda issue, the Commonwealth would represent that the district court did get this right whenever it held that the question by the prosecutor, why wasn't the test conducted on the defendant's hands, that that was an appropriate question under South Dakota v. Neville, where the United States Supreme Court said that you can use the refusal to submit to a blood test against a defendant. That does not implicate the Fifth Amendment right to be free from self-incrimination. And also, there's a Western District Court case, Commonwealth v. Monaghan, that then takes the Neville case and applies it to the refusal to submit to a neutron activation test. And so we would submit that that was a proper question, was proper for the officer to say he refused to submit to that. Obviously, we have some problematic— Officers shouldn't have said about Miranda, right? Yeah, he shouldn't have said what he said, and either the prosecutor or defense counsel should have asked for a curative instruction. But the Commonwealth here today would represent that what the defense attorney did with that officer's comment was he used it to his advantage. And at the PCRA hearing, he testified to this. He said, you know, we had Tom Hanson who had just testified. It was looking pretty kind of bad, is what he was saying, for my client. And looking at the jurors, you've got people looking jaundiced were his words. And so I, you know, considered whether or not to object and didn't. And what he did, basically, the court at that point, the most it would have done, in my opinion, would be give a curative instruction. What he did was he gave his own curative instruction, but he used it to his advantage. So you've got all this incriminating evidence coming in, and then you've got the officer saying, well, Tom Hanson submitted to an x-ray test, and his hands were clean, but Tim Hanson would not submit to that test. And his response and use of that is, well, didn't he exercise his Miranda rights? What he's doing in that is saying to the jury, look, maybe this is looking bad, but you can't use this against my client, is really what he's trying to tell the jury by using that question to that officer. And that was what he testified to, that it was a trial strategy, and that he would later point out to them, you know, you can't use this against him. He was essentially taking something that could be used against him and trying to say this was his right to remain silent, so you can't use it against him. I would submit it's really the best thing that you could do in that situation is try to say, you can't use this against him when, in fact, the Commonwealth's position is it can be used against him to impeach him. So essentially then, just in closing, I believe the evidence in this case, you know, when you look at whether it would have changed the verdict or whether any error contributed to the verdict, I would submit that it couldn't have in this case and that basically you did have hard evidence. You had Tim Hansen's fingerprints on the gun. You had a nitrate test done on the other person who the finger was being pointed at. Tom Hansen and his hands were clean. And then you also had the powder burn on Tom Hansen's face, which many individuals, officers testified that they saw that burn, and the expert witness testified that that powder burn on the side of his face would not be consistent with him being the shooter. That's the hard evidence I believe, along with the jury determining, based upon the credibility of the witnesses, and most importantly, Betty Jo Wooten. You know, you have this girl who she's the most neutral witness that was there on the scene, you know, as far as what happened in that house, you know. She's neutral. And she basically, well, she's going to blame her boyfriend. But at the same time, she was threatened by her boyfriend to tell a lie, and that tape was played. And I believe that that is where the jury decided he was credible. You have this girl who was trying to be coerced into saying the exact story that the defendant had said up until the 95th yard. That's what they were trying to coerce her to say. So I believe the jury, you know, didn't make its determination. Any potential error didn't affect that determination. I thank the court. Thank you, Ms. Lamadina. Thank you. Rebuttal, Mr. Ancovia? Thank you, Your Honor. Your Honor, the Doyle v. Ohio errors that occurred in this case occurred because trial counsel did not recognize the seriousness of those errors. The Commonwealth is putting a marvelous spin on what defense counsel testified to at the PCRA hearing. The truth of what he said is he very often likes to bring out for the jury the fact that the defendant exercised his rights. He said this in two or three different contexts at the PCRA hearing. Counsel did not appreciate the seriousness of the Doyle error. The Doyle error in this case was in two phases, the failure to object to a classic Doyle testimony problem and the follow-up cross-examination, which exploited it. Now, counsel didn't exploit it maliciously to his own client. He exploited it because he didn't understand the error. Your Honors, this was not a gratuitous comment by Trooper Brown. I respectfully submit to the Court that if you consider the testimony, the record from page 546 of the appendix put forward, Brown wasn't just testifying as a neutral expert about I got a test from this guy and this is what it said and I didn't get a test from this guy because he wouldn't give me his hands. Brown testified fully about Tom Hanson being given Miranda warnings, waiving Miranda warnings, giving Trooper Brown a statement and then giving over his hands. This was the juxtaposition that the Commonwealth sought. They sought to juxtapose that with Tim Hanson when he was asked about the nitrate test, invoking his right to counsel and refusing not only to give his hands over but to say anything. But that juxtaposition was okay under Neville, right? I think we all agree that Miranda, the blurting out the Miranda by the Trooper was problematic. But why is the juxtaposition of Tom's willingness to submit to the nitrate test and Tim's unwillingness to do so problematic? Because the juxtaposition was not just with respect to the nitrate test. That's what I'm saying, Judge. If you look back at the testimony of Brown in developing how he interacted with Tom Hanson, it wasn't just that he took a nitrate test. He gave him Miranda warnings. Tom gave a statement. Tom waived his Miranda rights. This was all fully developed moments before he juxtaposes that with what Tim Hanson did. This was not a gratuitous blurting out. This was the well-developed symmetrical testimony of what Brown did with both of these people, and it went way beyond the nitrate test. And that's why it was a Doyle problem. And the worst part of this— Your client's doing a life sentence, so let's put five minutes on the clock. I want to make sure that you're fully heard here this morning. I appreciate that, Your Honor. Thank you. The problem with this Doyle error, and it has to be considered an error because it was brought out exactly in the way that Doyle would say you could not. The district attorney then asks, have you ever told anybody anything different from the time you talked to the police? That also is a problem based upon the cases that I've cited in the brief. And, Your Honor, I don't want to leave the podium without mentioning there is a more recent case that has come up since both parties have filed their briefs. It's a Ninth Circuit case. It is Hurd, H-U-R-D, versus Terhune, T-E-R-H-U-N-E. It's not yet in the Fed Third, but it is a published opinion. I have it at 2010 U.S. Appeal Lexus 17600. It was just decided in the end of August. And it grants federal habeas corpus relief on a witness, on a defendant, who was talking to the police and then invoked his rights. And this reinforces, I think, the case of Tim Hansen here under this Doyle problem. The Doyle problem, Your Honors, is an extraordinarily serious one in this case because it was developed in Brown's testimony. And even if one could say that Brown's testimony was a blurting out, defense counsel's cross-examination was not. Defense counsel's cross-examination was a carefully chosen question that was the result of an uninformed judgment about the seriousness of the error that he was exploiting. The district attorney says that at the PCRA hearing the attorney seemed to be concerned because he thought Tom Hansen's testimony was going so well and he needed something. That's not what he said. The district attorney said, I'm sorry, Mr. Bell, the counsel said, quote, in this case we had Tom giving some statements which everybody was looking jaundiced whether they were true or not. Betty Jo Wooten, I believe her name was, had testified, and there was some conflict because she gave some later different statements. What he was saying was these people were conflicted. He wasn't worried about their testimony at this point. He simply didn't realize the error that was being committed. The error was exploited. The error is a serious one. And as late as 2009 in the Davis case and in 2007 in Lafferty, this court has called that kind of error a fundamental deprivation of due process, and it occurred in this case along with the others, and I would respectfully submit, entitles the appellant in this case to the relief of a new trial. I have a question that has absolutely nothing to do with the merits of this case, and I don't want you to construe it. This petition was filed in 1902 and it sat before the district or before the magistrate judge for six years. That's correct. Is there a reason for this that you're aware of? No. It just sat there? Your Honor, I can say, and during the course of that period of time, I recall occasionally sending letters, copies to the district attorney, of course, simply saying to the magistrate, would the court like another brief, your argument, anything? Nothing. It was silent for six years. And the appalling length in which this case has taken to finally come to this court, 22 years after the trial, is not attributed to any sloth or lack of attention by Tim Hanson. At various points in this record, his lawyers and quite frankly the system completely let down. Thank you. Are you pro bono in this case, Mr. Nkobe? I had offered to be pro bono and then the court was kind enough to appoint me, apparently just to cover my costs, but that is my status. I'm certainly not privately retained. Thank you. All right. The court thanks both counsel for excellent argument. Thank you for the pro bono representation. The matter will be taken under advisement.